UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ x
DIVISION 1181 AMALGAMATED TRANSIT     :
UNION—NEW YORK EMPLOYEES PENSION FUND   :
and its Trustees MICHAEL CORDIELLO and STANLEY  :
BRETTSCHNEIDER,                                  :
                    Plaintiffs,     :
   -against-                               :
                                          :
CANAL ESCORTS, INC., LASALLE BUS SERVICE   :
INC., MAJOR BUSES INC., MINOR BUSES INC.,   :
YELLOW BUS, INC., STANDARD BUS      :
MAINTENANCE, INC., TALULLA REALTY INC. and  :
MAGOO ENTERPRISES, INC.,          :
                                          :
                Defendants.    :
------------------------------------------------------------------------ x

**MEMORANDUM
& ORDER**
14-CV-4575 (SMG)

GOLD, STEVEN M., U.S. Magistrate Judge:

## INTRODUCTION

      Plaintiffs Division 1181 Amalgamated Transit Union (the "Union")—New York

Employees Pension Fund (the "Fund"), and its Trustees Michael Cordiello and Stanley

Brettschneider (collectively with the Fund, "plaintiffs"), bring this action against defendants

Canal Escorts, Inc. ("Canal"), LaSalle Bus Service Inc., Major Buses Inc., Minor Buses Inc.,

Yellow Bus, Inc., Standard Bus Maintenance, Inc., Talulla Realty Inc., and Magoo Enterprises,

Inc. (collectively, except for Canal, "the Control Group Defendants")[1] pursuant to the

Employment Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, as

amended by the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), 29 U.S.C.

§ 1381 *et seq.*

---

[1] Defendants are New York corporations with the same principal place of business at 1 Coffey Street, Brooklyn, New York, 11231. Amended Compl. ¶ 8, Dkt. 7.

Plaintiffs now move for summary judgment against defendants, seeking an award of withdrawal liability, together with interest, liquidated damages, and reasonable attorneys' fees and costs under ERISA. Plaintiffs alternatively move for delinquent interim withdrawal liability payments and attendant damages. The case has been assigned to me for all purposes with consent of the parties, Dkt. 87, and I therefore rule on plaintiffs' motion by Memorandum and Order rather than by issuing a Report and Recommendation. For the reasons stated below, plaintiffs' motion for summary judgment is granted in its entirety. The Court finds defendants jointly and severally liable for the withdrawal liability sought by plaintiffs, together with interest, liquidated damages, and reasonable attorneys' fees and costs.

## BACKGROUND

### I. FACTS[2]

The New York City Department of Education ("DOE") operates the city's public school system and, for decades, has contracted with private bus companies to provide transportation services to students. Defs.' Rule 56.1 Statement ("Defs.' 56.1 Stmt.") ¶¶ 51, 56, Dkt. 96; Pls.' Rule 56.1 Reply ("Pls.' 56.1 Reply") ¶¶ 51, 56, Dkt. 100. The private bus companies, in turn, have hired escorts to assist with transporting special education students or subcontracted with escort companies, such as Canal, to provide that assistance. Defs.' 56.1 Stmt. ¶ 56; Pls.' 56.1 Reply ¶ 56.

In 1979, following a labor dispute, the DOE reached a negotiated agreement, known as the "Mollen[3] Agreement," with certain local transit unions. Defs.' 56.1 Stmt. ¶ 59; Pls.' 56.1 Reply ¶ 59. This agreement provided for a number of employee protection provisions (EPPs),

---

[2] Many of the facts set forth by plaintiffs are undisputed. The Court draws every reasonable inference in favor of defendants as the non-movants. *See Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 167 (2d Cir. 2014).

[3] The Honorable Milton Mollen was at that time the Presiding Justice of the New York Appellate Division, Second Department.

such as requiring each contractor to fill vacancies from a pool of union members on a seniority list and contribute to the Fund on behalf of its employees. Defs.' 56.1 Stmt. ¶¶ 60–61; Pls.' 56.1 Reply ¶¶ 60–61.

The Fund "is a multiemployer pension plan within the meaning of Sections 3(37) and 4001(a)(3) of [ERISA], 29 U.S.C. §§ 1002(37) and 1301(a)(3), that provides retirement benefits to eligible participants." Pls.' Rule 56.1 Statement ("Pls.' 56.1 Stmt.") ¶ 1, Dkt. 92; Defs.' 56.1 Stmt. ¶ 1. The Fund was established and is maintained pursuant to a Trust Agreement. Pls.' 56.1 Stmt. ¶ 11; Defs.' 56.1 Stmt. ¶ 11; *see* Trust Agreement, Dkt. 93-2. The Trustees, pursuant to the authority vested in them by the Trust Agreement, adopted the Fund's Policy for Collection of Delinquent Contributions (the "Delinquency Policy") and the Fund's Withdrawal Liability Rules. Pl.'s 56.1 Stmt. ¶¶ 13, 17; Defs.' 56.1 Stmt. ¶¶ 13, 17; *see* Delinquency Policy, Dkt. 93-3; Withdrawal Liability Rules, Dkt. 93-4. Section 10.1 of the Withdrawal Liability Rules provides that any disputes between an employer and the Fund concerning a determination made under those rules is subject to compulsory arbitration. Of particular relevance here, section 10.2 of the Withdrawal Liability Rules provides that "arbitration shall be initiated and conducted in accordance with regulations promulgated by the Pension Benefit Guaranty Corporation ["PBGC"] at 29 § CFR 4221.1 *et seq.*" Withdrawal Liability Rules at 14–15.

In or about the same year as the Mollen Agreement, nonparty Joseph Fazzia successfully bid on a contract to provide bus services for DOE routes. Defs.' 56.1 Stmt. ¶¶ 54, 63; Pls.' 56.1 Reply ¶¶ 54, 63. At that time, all escorts for special education students were employed by a single company, Professional Detail Service. Defs.' 56.1 Stmt. ¶ 64; Pls.' 56.1 Reply ¶ 64. However, in 1980, the DOE terminated its relationship with Professional Detail Service and thereafter required bus companies, such as the ones operated by Fazzia, either to employ escorts

or subcontract with escort companies. Defs.' 56.1 Stmt. ¶ 64; Pls.' 56.1 Reply ¶ 64. Fazzia initially hired escorts as employees of his bus companies and, in 1997, incorporated Canal as a separate entity to provide escorts for the routes served by his bus companies. Defs.' 56.1 Stmt. ¶¶ 64, 65; Pls.' 56.1 Reply ¶¶ 64, 65.

Canal operated through informal subcontracts with bus companies servicing DOE bus routes. Defs.' 56.1 Stmt. ¶ 69; Pls.' 56.1 Reply ¶ 69. In order to operate through these informal subcontracts, Canal became a signatory to and bound by a Collective Bargaining Agreement ("CBA") with the Union. Defs.' 56.1 Stmt. ¶ 69; Pls.' 56.1 Reply ¶ 69; *see* CBA, Dkt. 93-1. As a signatory to the CBA, Canal was "obligated to contribute to the Fund on behalf of its covered employees" and "abide by the terms and conditions of the Fund's Trust Agreement." Pls.' 56.1 Stmt. ¶¶ 6, 9; Defs.' 56.1 Stmt. ¶¶ 6, 9. The DOE reimbursed Canal's expenses, including its contributions to the Fund. Defs.' 56.1 Stmt. ¶ 70; Pls.' 56.1 Reply ¶ 70. The DOE also paid Canal a management fee that was calculated as a percentage of Canal's total revenues and paid to Fazzia as the sole office employee of Canal. Defs.' 56.1 Stmt. ¶ 71; Pls.' 56.1 Reply ¶ 71.

The DOE determined the bus routes that would be approved, the dates and times that escort services would be provided, and the process for certifying individuals seeking employment as escorts. Defs.' 56.1 Stmt. ¶¶ 72, 73; Pls.' 56.1 Reply ¶¶ 72, 73. The DOE also provided training for escorts and was involved in disciplining them. Defs.' 56.1 Stmt. ¶¶ 74, 75; Pls.' 56.1 Reply ¶¶ 74, 75. Canal was not allowed to provide its own training for escorts. Defs.' 56.1 Stmt. ¶ 74; Pls.' 56.1 Reply ¶ 74.

In 2013, the DOE began soliciting bids for new bus and escort contracts that did not include EPPs. Defs.' 56.1 Stmt. ¶ 80; Pls.' 56.1 Reply ¶ 80. The Union went on strike, and Canal, in turn, decided to terminate its striking escorts. Defs.' 56.1 Stmt. ¶ 82; Pls.' 56.1 Reply

¶ 82. When the strike ended in February 2013, Fazzia agreed to rehire two-thirds of the terminated escorts. Defs.' 56.1 Stmt. ¶ 83; Pls.' 56.1 Reply ¶ 83.

In 1983, the Fund received an exemption from PBGC that allowed it not to assess withdrawal liability on employers who stopped doing business with the DOE. Defs.' 56.1 Stmt. ¶ 84; Pls.' 56.1 Reply ¶ 84. In April 2013, though, the Fund changed its rules so that the exemption no longer applied. Defs.' 56.1 Stmt. ¶ 84; Pls.' 56.1 Reply ¶ 84. Canal asserts that when it agreed to rehire the terminated escorts, it "did not know that the Fund was going to change its rules and that the Fund would attempt to assess millions of dollars of withdrawal liability against Canal if it ceased operations." Defs.' 56.1 Stmt. ¶ 85; Pls.' 56.1 Reply ¶ 85.

Canal was still bound by the CBA to contribute to the Fund on behalf of its covered employees even after the DOE solicited new contracts without EPPs in 2013. Defs.' 56.1 Stmt. ¶ 80; Pls.' 56.1 Reply ¶ 80. As a result, Canal could not compete with other companies that were not bound by the CBA and were therefore able to bid for escort service contracts at lower rates. Defs.' 56.1 Stmt. ¶¶ 80, 81; Pls.' 56.1 Reply ¶¶ 80, 81. These circumstances essentially forced Canal to cease operations. Defs.' 56.1 Stmt. ¶ 81; Pls.' 56.1 Reply ¶ 81.

The Fund subsequently determined that on or about August 6, 2013, Canal "effected a 'complete withdrawal' from the Fund as defined in ERISA § 4203, 29 U.S.C. § 1383." Pls.' 56.1 Stmt. ¶ 26; Defs.' 56.1 Stmt. ¶ 26. On December 12, 2013, the Fund sent to Canal a Notice and Demand, which informed Canal that its "withdrawal liability was $4,229,356.00, payable according to the schedule contained therein in 71 quarterly payments of $105,004.63 [plus] a final quarterly payment of $23,902.99," and that the "first payment was due to the Fund by February 10, 2014 and quarterly thereafter." Pls.' 56.1 Stmt. ¶¶ 27, 28; Defs.' 56.1 Stmt. ¶¶ 27, 28; *see* Notice & Demand, Dkt. 93-5. The Notice and Demand further stated that the withdrawal

liability was owed by Canal and "any or all trades or businesses under common control with Canal." Pls.' 56.1 Stmt. ¶ 29 (quoting Notice and Demand at 1); Defs.' 56.1 Stmt. ¶ 29.[4] Canal received the Notice and Demand on or about December 14, 2013. Pls.' 56.1 Stmt. ¶ 30; Defs.' 56.1 Stmt. ¶ 30. Neither Canal nor any of the Control Group Defendants made any payments to the Fund pursuant to the schedule set forth in the Notice and Demand. Pls.' 56.1 Stmt. ¶ 31; Defs.' 56.1 Stmt. ¶ 31.

On March 3, 2014, Canal, through counsel, sent a letter to the Fund requesting review of the Fund's withdrawal liability assessment ("Request for Review"). Pls.' 56.1 Stmt. ¶ 37; Defs.' 56.1 Stmt. ¶ 37; *see* Request for Review, Dkt. 93-8. On June 3, 2014, the Fund responded to the request but declined to alter its assessment ("Response Letter"). Pls.' 56.1 Stmt. ¶ 38; Defs.' 56.1 Stmt. ¶ 38; *see* Response Letter, Dkt. 93-9. Canal received the Response Letter on June 5, 2014. Pls.' 56.1 Stmt. ¶ 38; Defs.' 56.1 Stmt. ¶ 38.

On June 9, 2014, the Fund sent another letter ("the Default Letter") notifying Canal that, as a result of its failure "to make its first two scheduled payments of $105,004.63, which were due by February 10, 2014 and May 10, 2014," Canal was also liable for "interest [that] has accumulated on the unpaid installments in the amount of $2,250.41 to date, and will continue to accumulate from the date due through the date paid." Default Letter at ECF pg. 2, Dkt. 93-6[5]; *see* Pls.' 56.1 Stmt. ¶ 32; Defs.' 56.1 Stmt. ¶ 32. The Default Letter also advised Canal that "failure to cure this delinquency within [60] days of the receipt of this letter will constitute a default within the meaning of [s]ection 4219(c)(5) of ERISA" and that, in the event of default,

---

[4] Businesses that are either under "common control" or that are otherwise part of a "control group" are "treated as a single employer for purposes of ERISA withdrawal liability." *Amalgamated Lithographers of Am. v. Unz & Co., Inc.*, 670 F. Supp. 2d 214, 223 (S.D.N.Y. 2009); *see* 29 U.S.C. § 1301(b)(1).

[5] The page number in the text refers to the pagination attributed by ECF and not to the internal page numbers, if any, on the document itself.

"the Fund will require immediate payment of the entire amount of the withdrawal liability." Default Letter at ECF pg. 2; *see* Pls.' 56.1 Stmt. ¶ 32; Defs.' 56.1 Stmt. ¶ 32. Canal received the Default Letter on June 13, 2014. Pls.' 56.1 Stmt. ¶ 33; Defs.' 56.1 Stmt. ¶ 33. Neither Canal nor the Control Group Defendants made a payment to the Fund by August 12, 2014—60 days from the receipt of the Default Letter. Pls.' 56.1 Stmt. ¶¶ 33–34; Defs.' 56.1 Stmt. ¶¶ 33–34.

## II.  PROCEDURAL HISTORY

On July 31, 2014, plaintiffs commenced this action against Canal to collect withdrawal liability payments. Compl., Dkt. 1. On August 4, 2014, Canal, through counsel, sent a letter notifying plaintiffs that, on or about August 1, 2014, "Canal had purported to initiate arbitration regarding the Fund's withdrawal liability assessment" with the American Arbitration Association ("AAA"). Pls.' 56.1 Stmt. ¶ 39; Defs.' 56.1 Stmt. ¶ 39; *see* Letter to Fund enclosing Canal's Demand for Arbitration ("AAA Letter"), Dkt. 93-10.

Canal did not attach the Notice and Demand, the Request for Review, or the Response Letter to its AAA letter. Pls.' 56.1 Stmt. ¶ 40; Defs.' 56.1 Stmt. ¶ 40. On August 11, 2014, plaintiffs sent separate letters to Canal and the AAA demanding that the matter before the AAA be dismissed immediately. Pls.' 56.1 Stmt. ¶ 41; Defs.' 56.1 Stmt. ¶ 41; *see* Dismissal Demand to Canal dated Aug. 11, 2014, Dkt. 93-11; Dismissal Demand to AAA dated Aug. 11, 2014, Dkt. 93-11. Specifically, plaintiffs argued that (1) the AAA does not have jurisdiction under the regulations promulgated by the PBGC, and (2) Canal failed to comply with the PBGC regulations when it did not attach the Notice and Demand, Canal's Request for Review, or plaintiffs' Response Letter. On October 30, 2014, plaintiffs and Canal jointly requested that the AAA stay further arbitration proceedings pending the outcome of this litigation. Pls.' 56.1 Stmt. ¶ 42; Defs.' 56.1 Stmt. ¶ 42; *see* Stay Letter, Dkt. 93-12.

In the meantime, on October 10, 2014, plaintiffs filed an Amended Complaint, adding the Control Group Defendants as parties to the action. Amended Compl., Dkt. 7. On September 14, 2015, following a series of events not directly relevant here, defendants answered the Amended Complaint. Answer, Dkt. 51. Thereafter, defendants requested, among other things, a stay of all proceedings pending a final decision in *Div. 1181 Amalgamated Transit Union— N.Y. Emps. Pension Fund v. N.Y.C. Board of Educ. ("Div. 1181")*, Case No. 13-CV-9112 (S.D.N.Y.) (hereinafter, generally, "the DOE litigation"). Letter dated Sept. 28, 2015, Dkt. 52. The issue in the DOE litigation was whether the DOE is properly considered an employer of school bus escorts like those hired by Canal and may therefore be held liable for the same withdrawal liability plaintiffs are seeking from defendants in this case.

This case was essentially stayed while the DOE litigation proceeded to final judgment and an appeal to the Second Circuit. Between February 15, 2017 and January 22, 2019, the parties provided several updates on the status of the DOE litigation. *See*, *e.g.*, Dkt. 72, 79, 80, 82. In a final update, plaintiffs informed the Court that the Second Circuit had ruled, concluding that litigation. Letter dated Jan. 22, 2019, Dkt. 85. With the DOE litigation resolved, plaintiffs moved for summary judgment in this action. Not. of Mot. for Summ. J., Dkt. 90. Defendants opposed the motion, Mem. in Opp., Dkt. 95, and plaintiffs replied, Reply in Supp. of Mot. for Summ. J., Dkt. 99.

## III.   THE DOE LITIGATION

In 2013, the Fund commenced an action against the DOE, contending that the DOE should be considered to be an employer of the Fund's participants under the MPPAA and therefore jointly and severally responsible for withdrawal liability incurred by its Contractors, including Canal. The Fund's complaint identified several theories of liability: (1) the contracts

obligated the DOE to contribute to the Fund, (2) the DOE and the Contractors were a "single

employer," (3) the Contractors were "alter egos" of the DOE, and (4) the DOE and the

Contractors were "joint employers." *Div. 1181*, 2014 WL 4370724, at *4 (S.D.N.Y. Aug. 27,

2014). The DOE moved to dismiss the Fund's complaint for failure to state a claim. The

District Court dismissed the Fund's contract and single employer claims but denied the DOE's

motion as to the Fund's alter ego and joint employer claims. *See id.* at *9. The DOE then

moved for reconsideration, and the District Court granted the motion as to the Fund's claim that

the DOE and the Contractors were joint employers but denied the motion with respect to the

Fund's alter ego claim. *See Div. 1181*, 2014 WL 6647368, at *4 (S.D.N.Y. Nov. 24, 2014).

Following discovery, the DOE moved for summary judgment on the Fund's one

remaining theory of liability. The District Court granted the motion, reasoning that, based on the

evidence proffered by the Fund, no reasonable factfinder could conclude that the Contractors

were the alter egos of the DOE. *See Div. 1181*, 2017 WL 3738741, at *9 (S.D.N.Y. Aug. 30,

2017). On appeal, the Second Circuit affirmed in all respects and held that the DOE had no

obligation to contribute to the Fund pursuant to any of the legal bases the Fund had advanced.

*See Div. 1181*, 910 F.3d 608, 615–19 (2d Cir. 2018).

**DISCUSSION**

## I. PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

### 1. Standard of Review

A party moving for summary judgment must show that "there is no genuine dispute as to

any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a). If the movant meets that burden, the non-moving party may avoid summary judgment

only by "set[ting] forth specific facts showing that there is a genuine issue for trial." *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *accord Samuels v. Mockry*, 77 F.3d 34, 36 (2d Cir. 1996).  "Conclusory allegations, conjecture, and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).  Rather, a genuine dispute as to a material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see Mitchell v. Shane*, 350 F.3d 39, 47 (2d Cir. 2003).  "In deciding whether there is a genuine issue of material fact as to an element essential to a party's case, the court must examine the evidence in the light most favorable to the party opposing the motion, and resolve ambiguities and draw reasonable inferences against the moving party." *Abramson v. Pataki*, 278 F.3d 93, 101 (2d Cir. 2002) (internal quotation marks and citation omitted).

## 2.  Statutory Scheme

In 1974, Congress enacted ERISA to, among other things, "ensure that employees and their beneficiaries would not be deprived of anticipated retirement benefits by the termination of pension plans before sufficient funds have been accumulated in the plans." *Connolly v. Pension Benefit Guar. Corp.*, 475 U.S. 211, 214 (1986) (internal quotation marks and citations omitted); *see also T.I.M.E.-DC, Inc. v. Mgmt.-Labor Welfare & Pension Funds, of Local 1730 Int'l Longshoremen's Ass'n*, 756 F.2d 939, 943 (2d Cir. 1985).  As part of this statutory scheme, the PBGC, a wholly-owned government corporation within the Department of Labor, was created to "collect[] premiums from covered pension plans and pay[] out accrued benefits to employees in the event a pension plan has insufficient funds." *Trs. of Local 138 Pension Tr. Fund v. F.W. Honerkamp Co. Inc.*, 692 F.3d 127, 129 (2d Cir. 2012); *see* 29 U.S.C. § 1302.

"One type of pension plan regulated by ERISA is the multiemployer pension plan, in which multiple employers pool contributions into a single fund that pays benefits to covered

retirees who spent a certain amount of time working for one or more of the contributing employers." *Trs. of Local 138 Pension Tr. Fund*, 692 F.3d at 129. Plans of this sort are "advantageous in industries where companies frequently go in and out of business and employees transfer among employers, making a single-employer plan 'unfeasible.'" *Nat'l Integrated Grp. Pension Plan v. Dunhill Food Equip. Corp. ("Dunhill")*, 938 F. Supp. 2d 361, 366 (E.D.N.Y. 2013) (quoting *Trs. of Local 138 Pension Tr. Fund*, 692 F.3d at 129).

By the late 1970s, though, Congress became concerned that "ERISA did not adequately protect [multiemployer pension] plans from the adverse consequences that resulted when individual employers terminate[d] their participation in, or withdr[e]w from, multiemployer plans." *Pension Benefit Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 722 (1984). In 1980, Congress enacted the MPPAA to address this concern. The MPPAA ensures that multiemployer pension plans are adequately funded by requiring "an employer that withdraws from a multiemployer pension plan to pay its proportionate share of the plan's unfunded vested employee benefits," an amount referred to as its "withdrawal liability." *Bowers v. Andrew Weir Shipping, Ltd.*, 27 F.3d 800, 803 (2d Cir. 1994) (citing 29 U.S.C. §§ 1381, 1391). For the purposes of withdrawal liability, "all employees of trades or businesses (whether or not incorporated) which are under common control [must] be treated as employed by a single employer and all such trades and businesses as a single employer." 29 U.S.C. § 1301(b)(1). "Thus, each member of a commonly controlled group of trades or businesses is liable for the withdrawal liability of any other member of that group." *I.L.G.W.U. Nat'l. Ret. Fund v. ESI Grp., Inc.*, 2002 WL 999303, at *1 (S.D.N.Y. May 15, 2002), *aff'd sub nom. I.L.G.W.U. Nat'l. Ret. Fund v. Meredith Grey, Inc.*, 94 F. App'x 850 (2d Cir. 2003).

When an employer withdraws from a multiemployer pension plan, the plan sponsor must "(1) determine the amount of the employer's withdrawal liability, (2) notify the employer of the amount of the withdrawal liability, and (3) collect the amount of the withdrawal liability from the employer." 29 U.S.C. § 1382. The plan sponsor is required to notify the employer "[a]s soon as practicable" of the amount of the liability and determine a schedule for making liability payments, and demand that the employer pay the withdrawal liability in accordance with that schedule. 29 U.S.C. § 1399(b)(1). Once an employer receives notice, it has 90 days to (1) "ask the plan sponsor to review any specific matter relating to the determination of the employer's liability and the schedule of payments," (2) "identify any inaccuracy in the determination of the amount of the unfunded vested benefits allocable to the employer," and (3) "furnish any additional relevant information to the plan sponsor." 29 U.S.C. § 1399(b)(2)(A). Within 60 days of the notice, "notwithstanding [the employer's] request for review or appeal," the employer must begin paying the plan withdrawal liability. 29 U.S.C. § 1399(c)(2). If the employer sends the plan sponsor a request for review, the plan sponsor must, after "a reasonable review of any matter raised," notify the employer of its decision, the basis for its decision, and the reasons for any changes in the amount of the employer's liability or the schedule of liability payments. 29 U.S.C. § 1399(b)(2)(B).

### 3. Canal's Liability

A plaintiff seeking summary judgment must establish "(1) that defendants constituted an 'employer' under [the] MPPAA prior to the withdrawal; (2) that defendants received notice of a withdrawal liability assessment against them; and (3) that defendants failed to initiate arbitration as required by [the] MPPAA." *Dunhill*, 938 F. Supp. 2d at 366 (quoting *Bd. of Trs. of Trucking Emps. of N. Jersey Welfare Fund, Inc.—Pension Fund v. Canny*, 900 F. Supp. 583, 592

(N.D.N.Y. 1995)); *see also Trs. of Nat'l Ret. Fund v. Fireservice Mgmt. LLC*, 384 F. Supp. 3d 412, 422 (S.D.N.Y. 2019); *Labarbera v. United Crane & Rigging Servs., Inc.*, 2011 WL 1303146, at *4 (E.D.N.Y. Mar. 2, 2011).  Canal concedes that it received the Notice and Demand on or about December 14, 2013.  Defs.' 56.1 Stmt. ¶ 30.  Thus, the only questions that remain before plaintiffs may prevail on liability are whether Canal constitutes an employer under the MPPAA and whether Canal properly initiated arbitration as required by the MPPAA.

### a. Employer Status

Although the MPPAA does not define the term "employer," the Second Circuit has construed the term to mean "a person who is obligated to contribute to a plan either as a direct employer or in the interest of an employer of the plan's participants." *Korea Shipping Corp. v. N.Y. Shipping Ass'n-Int'l Longshoremen's Ass'n Pension Tr. Fund*, 880 F.2d 1531, 1537 (2d Cir. 1989) (internal quotation marks and citations omitted).  The MPPAA, in turn, defines the term "an obligation to contribute" to mean an obligation arising "(1) under one or more collective bargaining (or related) agreements, or (2) as a result of a duty under applicable labor-management relations law."  29 U.S.C. § 1392(a).

It is undisputed that "Canal was obligated to contribute to the Fund on behalf of its covered employees" under the CBA.  Pls.' 56.1 Stmt. ¶ 6; Defs.' 56.1 Stmt. ¶ 6.  Defendants, however, argue that the DOE—not Canal—should be held liable for any withdrawal liability under the alter ego and single employer doctrines.  *See* Mem. in Opp. at 4, 20–34.  This argument reflects a misunderstanding of these doctrines.

"The purpose of the alter ego doctrine in the ERISA context is to prevent an employer from evading its obligations under the labor laws 'through a sham transaction or technical change in operations.'"  *Ret. Plan of UNITE HERE Nat'l Ret. Fund v. Kombassan Holding A.S.*,

629 F.3d 282, 288 (2d Cir. 2010) (quoting *Newspaper Guild of N.Y., Local No. 3 of the Newspaper Guild, AFL-CIO v. N.L.R.B.*, 261 F.3d 291, 298 (2d Cir. 2001)). "[T]he test of alter ego status is flexible, allowing courts to weigh the circumstances of the individual case, while recognizing that the following factors are important: whether the two enterprises have substantially identical management, business purpose, operation, equipment, customers, supervision, and ownership." *Id.* (internal quotation marks and citation omitted). An "anti-union animus or an intent to evade union obligations" is "germane" but "not a *necessary* factor." *Id.* (internal quotation marks and citation omitted). Of particular significance in this case, as discussed below, "[i]f two companies are deemed alter egos of each other, then each is bound by the collective bargaining agreements signed by the other." *Lihli Fashions Corp., Inc. v. N.L.R.B. ("Lihli")*, 80 F.3d 743, 748 (2d Cir. 1996).

The alter ego and single employer doctrines are "conceptually distinct." *Id.* (quoting *Truck Drivers Local Union No. 807, I.B.T. v. Reg'l Import & Export Trucking Co., Inc.*, 944 F.2d 1037, 1046 (2d Cir. 1991)). Under the single employer doctrine, a collective bargaining agreement binding on one employer may also be enforced against a non-signatory employer "if the employers constitute a 'single employer' and if the employees of the companies constitute a single appropriate bargaining unit." *Brown v. Sandimo Materials*, 250 F.3d 120, 128 n.2 (2d Cir. 2001). "Separate companies are considered a single employer if they are part of a single integrated enterprise." *Lihli*, 80 F.3d at 747 (internal quotation marks and citations omitted). To determine whether separate entities act as a single integrated enterprise, courts in the Second Circuit consider the following non-dispositive factors: (1) interrelated operations, (2) common management, (3) centralized control of labor relations, and (4) common ownership. *See Radio &*

*Television Broad. Technicians Local Union 1264 v. Broad. Serv. of Mobile, Inc.*, 380 U.S. 255, 256 (1965) (per curiam).

The Second Circuit in the DOE litigation, described above, has already held that the DOE is not an alter ego of or a single employer with Canal. See *Div. 1181*, 910 F.3d at 617–18.[6] Specifically, the Court held that the Contractors—including Canal—were not alter egos of the DOE because there was "nothing in the record supporting the conclusion that the Contractors were 'disguised continuance[s]' of the DOE or that the DOE's transportation contracts were 'sham transaction[s]' designed to avoid obligations under the CBAs." *Id.* at 618 (quoting *Lihli*, 80 F.3d at 748). Indeed, the Court reasoned, "[i]t [wa]s undisputed that the Contractors managed their own budgeting and finances, made their own salary decisions, retained legal and accounting firms of their own choosing, and elected officers who were unaffiliated with the DOE" and that "the Contractors operated out of their own offices and had sole ownership of (or leasing rights to) the buses they used to perform contract work." *Id.* The Court further noted that the Fund "failed to proffer any evidence that the DOE and the Contractors were commonly owned or that the DOE harbored anti-union animus." *Id.* Moreover, the Court held that the evidence adduced by the Fund that "the DOE extensively monitored the Contractors' compliance with the contracts and that Contractor managers felt obligated to meet the DOE's demands . . . show[ed] little more than the existence of a long-term vendor-vendee relationship in a highly regulated commercial setting." *Id.*

---

[6] The Fund also commenced separate actions against B&M Escorts, Inc. ("B&M") and R and C Transit, Inc. ("R&C") to collect delinquent withdrawal liability. In those cases, B&M and R&C filed third-party complaints against the DOE. However, the district courts in both cases dismissed these third-party complaints, *see Div. 1181 Amalgamated Transit Union—N.Y. Emps. Pension Fund v. B & M Escorts, Inc. ("B&M")*, 2018 U.S. Dist. LEXIS 119208 (E.D.N.Y. May 29, 2018); *Div. 1181 Amalgamated Transit Union—N.Y. Emps. Pension Fund v. R & C Transit, Inc. ("R&C Transit")*, 2018 WL 794572 (E.D.N.Y. Feb. 7, 2018) and subsequently granted summary judgment in favor of the Fund with respect to at least some of its claims against the direct defendants, *see R&C*, 2019 WL 2436115 (E.D.N.Y. Feb. 14, 2019); *B&M*, 2018 WL 2417842 (E.D.N.Y. May 29, 2018).

The Court also held that the DOE was not bound by the Contractors' CBAs as a single employer because the Fund "ha[d] not pleaded DOE involvement to a degree that would suggest that the DOE and the Contractors were a single integrated enterprise." *Id.* at 617 (internal quotation marks and citation omitted). The Court specifically noted that "[t]he Fund concede[d] that the DOE and the Contractors were not commonly owned, and . . . made no argument based on centralized control of labor relations." *Id.* The Court also reasoned that the Fund's allegations that "the DOE determined the routes assigned to each Contractor and dictated maintenance and cleaning requirements for the buses" and "required each Contractor to maintain a website connection with the DOE" did not necessarily suggest an interrelation of operations but were "equally consistent with an arm's-length contractual relationship." *Id.* (internal quotation marks omitted). Finally, with respect to the common management factor, the Court pointed out that the "contractual provisions prohibiting the Contractors from replacing their Chief Executive Officers or effecting a significant change in ownership without DOE approval" were "typical in commercial contracts" and "d[id] not plausibly suggest that the DOE and the Contractors had a common management structure, especially where, as here, the contracts also contained an express conflict-of-interest clause that prohibited DOE officers and employees from serving on the board of any Contractor." *Id.*

Defendants seek to distinguish the DOE litigation decisions described above and argue that they "have no application here." Mem. in Opp. at 31. Specifically, defendants assert that, "[b]y lumping Canal in with bus companies," the Second Circuit failed to "recognize that the arguments that the DOE is an alter ego or single employer are much stronger for escort companies than bus companies." *Id.* at 32. As to the alter ego doctrine, defendants point out that Canal, unlike the bus companies at issue in the DOE litigation, did not own any equipment,

have independent business strategies or purpose, or devise plans to provide safe and timely service. *See id.* Defendants further point out that Canal did not make any salary decisions because the escorts' salaries and its own management fee were both set by the DOE. *See id.* at 33. As to the single employer doctrine, defendants assert, among other things, that "[i]t is impossible to conceive of Canal's relationship with the DOE as taking place at arm's length" because "Canal operated entirely through informal, unwritten contracts." *Id.* at 34 (internal emphasis omitted).

Although bus and escort companies are undoubtedly distinct in a variety of ways, it is apparent from the language of its decision that the Second Circuit did not overlook Canal. Indeed, the Court, in its recitation of the facts, explained the escorts' responsibilities and duties and the cost reimbursement provision in the contracts that applied only to escorts. *See Div. 1181*, 910 F.3d at 612–13. Moreover, in making its determination that the DOE had no obligation to contribute to the Fund under the transportation contracts, the Court recognized that "[t]he contractual landscape diverge[d] slightly for escort employees, requiring [the Court] to further analyze the claims involving them." *Id.* at 616. Thus, if the Court had seen a distinction between bus companies and escort companies relevant to its alter ego and single employer analyses, it would have said so, as it did in its contract analysis. Accordingly, the Second Circuit's holding that the DOE is not an alter ego of or single employer with Canal is clearly relevant and informative here.

In any event, even if this Court were to hold the DOE to be an alter ego of or single employer with Canal, that holding would at most render the DOE jointly-and-severally liable with Canal. *See Lihli*, 80 F.3d at 748; *see also Trs. of Mosaic & Terrazzo Welfare, Pension, Annuity & Vacation Funds v. High Performance Floors, Inc.*, 233 F. Supp. 3d 329, 333–34

(E.D.N.Y. 2017), *reconsideration denied*, 2018 WL 334439 (E.D.N.Y. Jan. 8, 2018). Neither defendants nor independent research by this Court reveals any cases that a finding of alter ego or single employer status would absolve Canal of its liability. Because Canal was clearly required to contribute to the Fund under the CBA, it is an employer under the MPPAA and therefore subject to withdrawal liability.

### b. Arbitration

Plaintiffs argue that Canal waived its right to challenge the withdrawal liability assessment because it failed to properly initiate arbitration under the MPPAA. *See* Pls.' Mem. in Supp. of Mot. for Summ. J. ("Summ. J. Mem.") at 10, Dkt. 91. Specifically, plaintiffs assert that Canal's attempt to initiate arbitration at the AAA was ineffective because (1) Canal failed to attach the Notice and Demand, Request for Review, and Response Letter to the purported arbitration initiation as required by 29 C.F.R. § 4221.3(d); and (2) the Withdrawal Liability Rules did not allow for initiation of arbitration with the AAA. *Id.* at 11–12. Defendants counter that Canal did not waive its right to challenge the withdrawal liability assessment because its initiation of arbitration with the AAA was timely and effective. *See* Mem. in Opp. at 15.[7]

Employers seeking to challenge a withdrawal liability assessment must do so through arbitration. *See* 29 U.S.C. § 1401(a)(1); *see also N.Y.S. Teamsters Conference Pension & Ret. Fund v. Express Servs., Inc.*, 426 F.3d 640, 645 (2d Cir. 2005). Either party may initiate arbitration within 60 days after the earlier of (A) the plan sponsor's response to the employer's

---

[7] In *Div. 1181 Amalgamated Transit Union—N.Y. Emps. Pension Fund v. Logan Transp. Sys., Inc.*, 293 F. Supp. 3d 336, 349 (E.D.N.Y. Mar. 30, 2018), the defendants asserted that they properly initiated arbitration in their answer and counterclaims and then again in their letter to the AAA. The plaintiffs countered that the letter to the AAA did not initiate arbitration under the PBGC regulations because, among other things, it "failed to attach the required documents." 293 F. Supp. 3d at 351 n.13. However, the Court did not decide any issues involving the AAA letter "in light of its conclusion that [the] defendants properly initiated arbitration through their answer and counterclaims." *Id.* Therefore, although several arguments made in that case are similar to those raised here, the decision is not instructive with respect to whether Canal properly initiated arbitration.

request for review under section 1399(b)(2)(B), or (2) 120 days after the employer's request for review under section 1399(b)(2)(A). *See* 29 U.S.C. § 1401(a)(1). Alternatively, the parties may jointly initiate arbitration within 180 days of the initial notice of withdrawal liability. *See id.* If an arbitration proceeding is not initiated within the statutory time period, the amounts demanded by the plan sponsor are "due and owing on the schedule set forth by the plan sponsor" and the "plan sponsor may bring an action in a State or Federal court of competent jurisdiction for collection." *Id.* § 1401(b)(1). Moreover, a defendant that does not initiate arbitration "waives its right to arbitration and its right to assert any defenses in an action seeking withdrawal liability." *Dunhill*, 938 F. Supp. 2d at 366 (quoting *Finkel v. Fred Todino & Sons, Inc.*, 2010 WL 4646493, at *4 (E.D.N.Y. Oct. 8, 2010)). "Congress intended that disputes over withdrawal liability would be resolved quickly, and established a procedural bar for employers who fail to arbitrate disputes over withdrawal liability in a timely manner." *ILGWU Nat. Ret. Fund v. Levy Bros. Frocks, Inc.*, 846 F.2d 879, 887 (2d Cir. 1988). The Second Circuit has noted that "[t]he failure to seek [arbitration] on a timely basis may, in some instances, lead to a harsh result, but the harshness of the default is largely 'a self-inflicted wound.'" *Id.* (internal citation omitted).

Under the MPPAA, arbitration proceedings must "be conducted in accordance with fair and equitable procedures to be promulgated by the [PBGC]." 29 U.S.C. § 1401(a)(2). The PBGC has promulgated regulations, and they require an employer initiating arbitration to "include in the notice of initiation a statement that it disputes the plan sponsor's determination of its withdrawal liability and is initiating arbitration" and attach "[a] copy of the demand for withdrawal liability and any request for reconsideration, and the response thereto." 29 C.F.R. § 4221.3(d); *see Div. 1181 Amalgamated Transit Union—N.Y. Emps. Pension Fund v. Logan Transp. Sys., Inc.*, 293 F. Supp. 3d 336, 350 (E.D.N.Y. Mar. 30, 2018). The PBGC regulations

also provide that "[i]f a party fails to object promptly in writing to deficiencies in an initiation agreement or a notice of initiation of arbitration, it waives its right to object." 29 C.F.R. § 4221.3(e).

Here, Canal sent its Request for Review on March 3, 2014, and the Fund, in turn, sent its Response Letter on June 3, 2014, which was received by Canal on June 5, 2014. *See* Pls.' 56.1 Stmt. ¶¶ 37–38; Defs.' 56.1 Stmt. ¶¶ 37–38. Canal was, as noted above, required under the MPPAA to initiate arbitration by the earlier of: (1) 60 days from the Response Letter (August 4, 2014) or (2) 60 days from 120 days after the Request for Review (August 30, 2014). Accordingly, August 4, 2014—the earlier of the two dates—was the date by which Canal was required to properly initiate arbitration.

Although Canal provided notice to plaintiffs of its purported initiation of arbitration with the AAA on August 4, 2014, it did not attach the Notice and Demand, Request for Review, and Response Letter to the purported initiation. *See* Defs.' 56.1 Stmt. ¶ 40. As stated above, though, section 10.2 of the Withdrawal Liability Rules provides that "arbitration shall be initiated and conducted in accordance with regulations promulgated by the [PBGC] at 29 § CPR 4221.1 *et seq*." Withdrawal Liability Rules at 14–15. Thus, on August 11, 2014, the Fund, in accordance with 29 C.F.R. § 4221.3(e), objected on the grounds that (1) the AAA lacked jurisdiction over the arbitration and (2) Canal failed to comply with 29 C.F.R. § 4221.3(d) when it did not attach the Notice and Demand, Request for Review, and Response Letter. *See* Pls.' 56.1 Stmt. ¶ 41; Defs.' 56.1 Stmt. ¶ 41. Because Canal attempted to initiate arbitration on the last date permitted under the statutory timeframe, it had no opportunity to cure any deficiencies in its notice.

Defendants assert that the Withdrawal Liability Rules, by referencing 29 § CPR 4221.1 *et seq*. on page 15, authorize the use of PBGC-approved alternative procedures, such as the AAA,

for withdrawal liability arbitrations pursuant to 29 § CPR 4221.14 because 29 § CPR 4221.1 *et seq.* encompasses section 4221.14.  Mem. in Opp. at 17–18.  Defendants further argue that Canal was not required to attach the documents required by 29 C.F.R. § 4221.3(d) because this provision does not apply to AAA arbitrations.  *Id.* at 15–16.

Defendants' argument misconstrues the PBGC regulations by suggesting that they permit the use of alternative arbitration procedures, such as those followed by the AAA, to resolve a dispute over withdrawal liability in any circumstance; in fact, the circumstances under which these alternative procedures may be used are limited.  As defendants correctly point out, Section 4221.14 of the PBGC regulations states that, in lieu of the procedures outlined in other sections of the regulations, "an arbitration may be conducted in accordance with an alternative arbitration procedure approved by the PBGC."  29 C.F.R. § 4221.14(a).  The regulations go on to provide that "[i]f an arbitration is conducted in accordance with a PBGC-approved arbitration procedure, the alternative procedure shall govern all aspects of the arbitration," with some exceptions not directly relevant here.  *Id.* § 4221.14(b).  Significantly, though, the regulations state that "[a] plan may by plan amendment *require* the use of a PBGC-approved procedure for all arbitrations of withdrawal liability disputes, or the parties may agree to the use of a PBGC-approved procedure in a particular case."  *Id.* § 4221.14(a) (emphasis added).  Thus, the plain text of the regulations indicates that an employer may initiate arbitration with the AAA and follow its procedures only when a plan requires AAA arbitration or when the employer has reached an agreement with the Fund to arbitrate before the AAA and pursuant to its rules in a particular case.  Neither precondition applies here.

In 1985, the PBGC approved the AAA rules as an alternative arbitration procedure.  *See* 50 Fed. Reg. 38046, 1985 WL 130480 (Sept. 19, 1985).  However, Canal has not pointed to any

authority for the proposition that an employer may initiate arbitration before the AAA and follow its procedures in the absence of a plan provision or an agreement by the parties authorizing it to do so. Rather, although courts "have held that the failure to initiate an arbitration with [the] AAA constituted a failure to 'initiate' arbitration under ERISA Section 4221," they have done so only "where the trust funds' rules *specifically required* the employer to initiate arbitration pursuant to AAA rules." *Operating Eng'rs' Pension Tr. Fund v. Fife Rock Prods. Co.*, 2011 WL 227665, at *5 (N.D. Cal. Jan. 24, 2011) (emphasis added) (holding that the defendant had properly initiated arbitration pursuant to the PBGC regulations and that the parties' subsequent agreement to adopt AAA rules did not require a second initiation under those rules); *Teamsters-Emp'rs Local 945 Pension Fund, v. Waste Mgmt. of New Jersey, Inc.*, 2011 WL 2173854, at *3 (D.N.J. June 2, 2011) (same); *see also I.L.G.W.U. Nat. Ret. Fund v. Meredith Grey, Inc.*, 94 F. App'x 850, 852 (2d Cir. 2003) (holding that defendant Davend, Corp.'s failure to file copies of the arbitration notice at the AAA regional office and to pay the administrative fee rendered the initiation of arbitration untimely because "the Fund's Trust Agreement clearly state[d] that '[a]ny arbitration' must proceed under rules set forth by the [AAA]"); *Robbins v. B & B Lines, Inc.*, 830 F.2d 648, 651 (7th Cir. 1987) (holding that the defendant's failure to pay the AAA filing fee rendered the initiation of arbitration untimely because "[t]he Fund's rules, read in conjunction with the AAA arbitration rules, explicitly require[d] a party initiating arbitration to pay the initial filing fee"); *Cent. States, Se. & Sw. Areas Pension Fund v. Allega Concrete Corp.*, 2014 WL 444206, at *3 (N.D. Ill. Jan. 28, 2014) (holding that the defendant's failure to comply with the AAA arbitration rules rendered the initiation of arbitration untimely because the Plan had—as authorized by the PGBC—adopted the AAA rules as its own).

Here, defendants point to no evidence suggesting that the Fund's governing documents were amended to require the use of the AAA for withdrawal liability arbitrations or that the Fund and Canal agreed to proceed before the AAA in this case. To the contrary, Section 10.1 of the Withdrawal Liability Rules merely states that arbitrations shall be initiated and conducted in accordance with 29 C.F.R. § 4221.1 *et seq.*, which in turn directs—in section 4221.14(a)—that a PBGC-approved alternative arbitration procedure may be adopted by plan amendment or agreed to in a particular case. The PBGC regulations, in other words, do not themselves approve of the use of alternative procedures such as proceeding before the AAA, but merely allow for them when required or agreed to by the parties. Because the Withdrawal Liability Rules do not specifically mention or describe the AAA or any other distinct alternative procedures, and because there is no contention in this case that the parties agreed to AAA arbitration pursuant to AAA procedures, the default PBGC regulations apply. Thus, Canal's failure to attach to its notice the Notice and Demand, Request for Review, and Response Letter—all of which were required for the initiation of arbitration under the default PBGC regulations—rendered its attempt to initiate arbitration with the AAA ineffective, and Canal has as a result waived its right to dispute the amount of its liability and assert defenses. *See Gesualdi v. Seacost Petroleum Prod., Inc.*, 97 F. Supp. 3d 87, 98 (E.D.N.Y. 2015).

### 4. Commonly Controlled Group

As noted above, under the MPPAA, "all businesses under common control are treated as a single employer for purposes of collecting withdrawal liability, and each is liable for the withdrawal liability of another." *Kombassan Holding A.S.*, 629 F.3d at 285 (internal quotation marks and citation omitted); *see* 29 U.S.C. § 1301(b)(1). Here, it is undisputed that "the Control Group Defendants were all under common control, as such term is defined in . . . 26 § U.S.C.

414(c), and the regulations promulgated thereunder, with Canal." Pls.' 56.1 Stmt. ¶ 5; Defs.' 56.1 Stmt. ¶ 5. Therefore, the Control Group Defendants are jointly and severally liable for any amounts owed by Canal, including reasonable attorneys' fees and costs, interest, and liquidated damages. *See Dunhill*, 938 F. Supp. 2d at 379 (holding that certain control group defendants were "jointly and severally . . . liable for the withdrawal liability, plus reasonable attorney's fees and costs, interest[,] and liquidated damages").

### 5. Damages

ERISA provides that in any action to compel payment of withdrawal liability, "any failure of the employer to make any withdrawal liability payment within the time prescribed shall be treated in the same manner as a delinquent contribution." 29 U.S.C. § 1451(b). Thus, in addition to the amount of withdrawal liability due and owing, plaintiffs are entitled to recover interest, liquidated damages, and reasonable attorneys' fees and costs. *See id.* § 1132(g)(2). I address each remedy in turn.

### a. Principal Amount of Delinquent Withdrawal Liability

As stated above, "[a]ny dispute concerning the Pension Fund's assessment of withdrawal liability has to be settled through arbitration, and an employer's failure to arbitrate or dispute the plan sponsor's calculation in the face of proper notification will result in the court's adoption of the sum proffered by the plan." *Gesualdi v. Ava Shypula Testing & Inspection, Inc.*, 2014 WL 1399417, at *6 (E.D.N.Y. Apr. 10, 2014) (internal quotation marks, alterations, and citation omitted). "After [the] failure to [properly] request arbitration, a court can adopt a proffered amount of withdrawal liability even in the absence of documentation as to how the figure was calculated." *Trs. of the Local 138 Pension Fund v. Tax Trucking Co.*, 2015 WL 13446776, at *4

(E.D.N.Y. June 2, 2015) (internal quotation marks and citations omitted), *report & recommendation adopted*, 2017 WL 2779685 (E.D.N.Y. June 26, 2017).

Here, the Fund's Notice and Demand provided that the total amount of withdrawal liability owed by Canal is $4,229,356.00 and that Canal was to pay this amount either in a single installment or by making quarterly payments of $105,004.63, beginning on February 10, 2014, plus a final quarterly payment of $23,902.99. *See* Notice & Demand at ECF pg. 2, Dkt. 93-5. After Canal failed to make its first two quarterly payments, the Fund sent a letter indicating that Canal was in default and that the total amount of withdrawal liability would be due if the default was not cured in 60 days. *See* Default Letter at ECF pg. 2, Dkt. 93-6. The default was not cured, and the Fund accelerated the total amount due pursuant to 29 U.S.C. § 1399(c)(5).

Defendants argue that, based on "[t]he equities of this situation" Canal "should be responsible only for its proportional share of any increase in unfunded vested benefits between the time the Fund instituted withdrawal liability in April 2013 and the time that Canal withdrew in June 2013." Mem. in Opp. at 34. But this Court cannot make that determination; as discussed above, the amount of withdrawal liability assessed by the Fund can be resolved only in arbitration. Because Canal failed to properly and timely initiate arbitration, it waived its right to dispute the amount assessed. Therefore, plaintiffs are entitled to recover the full amount of withdrawal liability of $4,229,356.00.[8]

**b.  Interest**

Pursuant to 29 U.S.C. § 1399(c)(5), plaintiffs are entitled to "accrued interest on the total outstanding liability from the due date of the first payment which was not timely made." 29

---

[8] Because this Court finds that defendants are jointly and severally liable for Canal's withdrawal liability, it is unnecessary to address plaintiffs' alternative argument that defendants are jointly and severally liable for Canal's delinquent interim withdrawal liability payments.

U.S.C. § 1132(g) provides that "interest on unpaid contributions shall be determined using the rate provided under the plan, or, if none, the rate prescribed under section 6621 of Title 26."

In this action, the CBA does not set an interest rate for withdrawal liability. However, the Delinquency Policy, as adopted by the Trustees pursuant to the Trust Agreement, provides that "contributions that are not paid on the Due Date shall accrue interest from the Due Date until the date payment is received at the rate of the Fund's custodial bank's prime rate plus 2% per annum." Delinquency Policy at 2, Dkt. 93-3; *see also Div. 1181 Amalgamated Transit Union— N.Y. Emps. Pension Fund v. R & C Transit, Inc.*, 2019 WL 2436144, at *6 (E.D.N.Y. Jan. 15, 2019), *report & recommendation adopted*, 2019 WL 2436115 (E.D.N.Y. Feb. 14, 2019).

Plaintiffs calculated the interest due on unpaid withdrawal liability from August 12, 2014—the date of acceleration—through and including July 24, 2019, which, according to plaintiffs, amounts to $1,238,530.92. Plaintiffs applied a rate of 5.25% through December 17, 2015; a rate of 5.50% from January 1–December 31, 2016; a rate of 5.75% from January 1– December 31, 2017; a rate of 6.50% from January 1–December 31, 2018; and a rate of 7.50% since January 1, 2019. Defendants do not dispute the methodology or the amount of the interest due through July 24, 2019 if Canal were held in default on its withdrawal liability. Defs.' 56.1 Stmt. ¶¶ 44–45. Accordingly, plaintiffs are awarded $1,238,530.92 in accrued interest on the amount of withdrawal liability, as of July 24, 2019, plus additional interest at the rate of 7.50% on the accelerated withdrawal liability amount of $4,229,356 from July 24, 2019 until final judgment is entered in this case.

### c. Liquidated Damages

29 U.S.C. § 1132(g)(2)(C) and the Delinquency Policy also provide for liquidated damages in an amount equal to the greater of interest on the unpaid contributions or 20% of the

unpaid contributions. *See* Delinquency Policy at 14. Here, 20% of $4,229,356.00 amounts to $845,871.20, which does not exceed the interest amount set forth above. Thus, plaintiffs are awarded liquidated damages in an amount equal to the amount of interest due on the date final judgment is entered.

### d. Reasonable Attorneys' Fees and Costs.

Plaintiffs are entitled to reasonable attorneys' fees and costs. 29 U.S.C. § 1132(g)(2)(D). Because they did not seek a specific amount of attorneys' fees and costs in their memorandum of law, plaintiffs, if they seek to recover fees and costs, may submit an appropriate motion, supported by contemporaneous billing records, within thirty days of the date of this Order.

### CONCLUSION

For the foregoing reasons, plaintiffs' motion for summary judgment is GRANTED. The Clerk shall enter judgment against defendants, jointly and severally, in the following amounts:

a) $4,229,356.00 in withdrawal liability;

b) $1,238,530.92 in accrued interest on the withdrawal liability, as of July 24, 2019, together with additional interest at the rate of 7.50% per annum on the accelerated withdrawal liability amount of $4,229,356 from July 24, 2019 until final judgment is entered;

c) Liquidated damages in an amount equal to the interest calculated on the withdrawal liability: and

d) Post-judgment interest pursuant to 28 U.S.C. § 1961 from the date final judgment is entered until the judgment is paid.

Plaintiffs, if they seek to recover the attorneys' fees and costs they have incurred in this action, may submit an appropriate motion, supported by contemporaneous billing records, within thirty days of the date of this Order.

_____/s/_____
Steven M. Gold
United States Magistrate Judge

Brooklyn, New York
March 26, 2020

U:\#JAV 2019-2020\Div. 1181 v. Canal Escorts\Mem. & Order.docx